UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

ELLIOT MURPHY,                                      :

                        Petitioner,       :       **REPORT AND**
                                                  **RECOMMENDATION**
                - against -               :       **TO THE HONORABLE**
                                                  **SIDNEY H. STEIN**

MICHAEL MCGUINESS,                        :

                        Respondent.       :       06 Civ. 1177 (SHS)(FM)

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

              Petitioner Elliot Murphy ("Murphy") brings this habeas proceeding,

pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction on one count

of Murder in the First Degree, following a jury trial in Supreme Court, New York County.

On July 13, 2000, Justice Daniel FitzGerald, before whom the case was tried, sentenced

Murphy to an indeterminate prison term of twenty-five years to life.

              In his habeas petition ("Petition" or "Pet."), Murphy claims that:  (a) his

guilt was not proved beyond a reasonable doubt and his conviction was against the weight

of the evidence; (b) the court improperly denied defense counsel's challenge of a juror for

cause; (c) a pretrial lineup identification was unduly suggestive; (d) both the prosecutor's

improper remarks in summation and the court's instructions to the jury deprived him of a

fair trial; (e) his conviction should have been reduced from first degree to second degree

murder; (f) the prosecution withheld exculpatory evidence; and (g) he was denied the

effective assistance of trial counsel.  (See Docket No. 2).  For the reasons that follow, the

Petition should be denied.  Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Murphy

should be denied a certificate of appealability because he has failed to make a substantial

showing of the denial of a constitutional right.

## II.     Background

### A.     Pretrial Identification

Prior to trial, Justice FitzGerald held a combined Huntley/Wade[1] hearing

during which several police officers and an Assistant District Attorney testified.  (H. 2, 4,

21, 40, 66, 82, 138, 157, 216, 221, 246, 284).[2]  The testimony at the hearing, insofar as

relevant, established that Murphy was arrested on March 16, 1999, on charges arising out

of the murder of Andre Silver ("Silver").  (Id. at 6-7, 11-12, 23-24, 27, 42-46, 68-69, 84-

85, 92, 139-41, 159, 248-49, 251-52).  After Murphy's arrest, Detectives Raymond Rivera

and Anthony Vasquez brought Silver's longtime girlfriend, Tamikka Pogue ("Pogue"),

---

[1]     See People v. Huntley, 15 N.Y.2d 72 (1965); United States v. Wade, 388 U.S. 218
(1967).  At a Huntley hearing, the court considers the admissibility of post-arrest statements
made by a criminal defendant.  See Georgison v. Donelli, No. 04 Civ. 1444 (DC), 2005 WL
1384015, at *1 n.2 (S.D.N.Y. June 9, 2005).  At a Wade hearing, the court considers whether a
pretrial identification of the defendant "has an independent basis of reliability and is therefore
admissible during trial."  Id.

[2]     "T." refers to the trial transcript.  "H." refers to the pretrial hearing transcript.
"V.D." refers to the transcript of the jury voir dire, which spanned two days ("V.D.I" and
"V.D.II").  "S." refers to the transcript of Murphy's sentencing.  "Ex." refers to the exhibits in the
Respondent's Appendix.  "Pet'r's Br." refers to Murphy's brief on appeal.  "Resp't's Br." refers
to the People's brief on appeal.  "Resp't's Mem." refers to the Respondent's memorandum in
opposition to Murphy's Petition.

who had witnessed the murder, to the police station to observe a lineup consisting of Murphy and five "fillers" obtained from a local homeless shelter.  (Id. at 165-67; see also T. 612-16, 727, 748).  The fillers all were somewhat smaller than Murphy, who was six feet, five inches tall and weighed approximately 300 pounds.  (H. 166, 170; see also T. 224).  To minimize this size disparity, all six men were seated with cardboard boxes masking their torsos.  (H. 170-71; see also T. 735-36).  After Pogue observed the lineup, she identified Murphy as the person who shot Silver.  (See Pet'r's Br. at 26).

On November 21, 2000, Justice FitzGerald granted Murphy's motion to suppress his post-arrest statement but denied his motion to suppress the lineup identification.  (Ex. A).  In his written decision, the Justice found that the fillers "were all of generally similar appearance to the defendant" and that the procedures employed were fair.  Although he acknowledged that there were differences in the builds of Murphy and the fillers, the Justice further found that the decision to seat the lineup participants and block their bodies from view "wholly eliminated" any disparity, and that there was "simply no possibility that anything done by the police would have led to an unreliable or mistaken identification."  (Id. at 11) (citation omitted).

B.    Voir Dire

During the second day of jury voir dire, prospective juror Karen Lu ("Lu"), a corporate lawyer, expressed concern about her ability to be fair and impartial because she had spent one summer working for the Office of the Attorney General of Delaware

and another summer working for "the U.S." and the "EEOC." (V.D.II 23-24). When Justice FitzGerald pursued this subject at the sidebar, Lu explained that she did not do any criminal work at the Attorney General's office and that her internship was a very long time ago. (Id. at 24). She then responded affirmatively when asked whether she could "put aside" her experience working for the government if chosen to serve on the jury. (Id. at 25).

During subsequent questioning by Murphy's defense counsel, Lu volunteered that she had done some work as a criminal lawyer representing crime victims. (Id. at 65). Although Lu stated that she was "sure that . . . [she] would be impartial," she also acknowledged that because she had never served on a jury, there was a "possibility" that she might not be impartial. (Id. at 65-66). When Justice FitzGerald entertained challenges for cause, Murphy's counsel consequently sought to excuse Lu because she "indicated she might have a bias." (Id. at 72). Justice FitzGerald then asked Lu to return to the courtroom for some follow-up questioning, during which the following exchange occurred:

THE COURT:      [I]s your sympathy such that if the People do not prove beyond a reasonable doubt that the defendant was the one who caused injury to another person, you will still vote to convict, because you have such sympathy for a victim?

[Lu]:      . . . I wouldn't think so. I think I can look at the evidence and make a determination . . . . I did mention the fact that . . . [,] in my experiences, I looked at things from a different point of view. I don't think that

4

biases are made automatically to say in any criminal case . . . the defendant should be held guilty, but again, as I mentioned, I haven't been in this position, so –

THE COURT: Are you worried you might do that because you feel so sorry for a victim that you're going to kind of make sure somebody pays . . . regardless of whether you're convinced beyond a reasonable doubt[] it's the right person?

[Lu]: I don't think [I] would do that.

THE COURT: You don't think so?

[Lu]: I believe I could be impartial and make a determination based on the facts.

THE COURT: What we need is 100 percent assurance . . . that you will make sure that you will not hold this defendant . . . responsible for the death of [the] victim[] even if the People haven't proved the case beyond a reasonable doubt.

[Lu]: I mean I think I could be.

THE COURT: You can give us your assurance that you will not hold him no matter how much sympathy that you have for the victim, you will not hold the defendant responsible unless the People have proved he's the one culpable; you can give us that assurance?

[Lu]: Ye[s].

(Id. at 73-74).

Based on Lu's assurance, Justice FitzGerald denied the defense's challenge for cause. (Id. at 75). Defense counsel subsequently exercised a peremptory challenge to

5

remove Lu, and ultimately exhausted all of the defense's twenty peremptory challenges. (V.D.I 183-85; V.D.II 75-77, 169-70, 173-74).

C.    <u>Trial</u>

1.    <u>People's Case</u>

The People's proof at trial would have permitted a reasonable juror to find as follows:

Murphy was known by the nickname "Powerful." He lived with his sister Justine and her boyfriend John Reynolds ("R.J.") in a two-bedroom apartment on Amsterdam Avenue between 144th and 145th Streets. (T. 223-24, 226). Silver and Pogue lived together only a few blocks away. (<u>Id.</u> at 423, 748).

Silver's nephew, Levar Tyson ("Tyson"), a neighborhood drug dealer, also resided in the vicinity. (<u>Id.</u> at 258, 419, 421). Tyson was friendly with R.J., who invited him to his apartment in April 1998 to watch a movie. (<u>Id.</u> at 257-58, 424-26, 437-38, 472). On that occasion, R.J. showed Tyson a sawed-off pump-action shotgun that he had obtained in exchange for a nine-millimeter handgun. (<u>Id.</u> at 438-40).

In early May 1998, R.J. and Murphy were having a conversation on the street when Tyson asked R.J. to join him "for a minute." (<u>Id.</u> at 429). Evidently annoyed by the disruption, Murphy turned to Tyson and said, "You see I'm talking, mind your business." As their disagreement escalated, Murphy told Tyson, "I will crush you, break you," or words to that effect. Tyson walked away, but subsequently reported the incident

to Silver.  (Id.).  The next day, still upset about being "disrespected," Murphy tried to punch Tyson in the face.  (Id. at 486-87, 493).

Several days later, Tyson was sitting on a car when Murphy approached, "swung" at him, and unsuccessfully attempted to reach into his pockets.  (Id. at 430-31).  After Tyson slipped off the car's hood, the two began to wrestle, but soon separated.  Murphy then left the area with R.J.  (Id. at 431).  Once again, Tyson told Silver about the fight.  (Id. at 431-32).

On yet another occasion, Murphy approached Tyson on the street with a penknife drawn.  (Id. at 432).  Tyson displayed his own knife and the two exchanged words, but there was no physical altercation; instead, Tyson walked away.  (Id. at 432-34).

Silver was in his car with Tyson on a subsequent night when they saw Murphy.  (Id. at 434).  After Silver asked Murphy if he had a problem with Tyson, Murphy responded, "Yeah, he got a bad mouth," and threatened to "bring it to him," meaning that he would cause Tyson physical harm.  (Id. at 435, 496-97).  Following this exchange, Silver and Tyson drove away.  (Id. at 435).

During the early morning hours of May 23, 1998, Murphy entered his sister's bedroom in the apartment they shared.  (Id. at 228).  He reported to his sister that he had seen Silver several hours earlier, at which time Silver "r[a]n up on him in his car" and threatened that Murphy was not going to make any money on the street.  (Id. at 229,

248).  According to Murphy, Silver apparently also threatened to "gun him down."  (Id. at 230).  After Murphy expressed uncertainty as to whether Silver was "bullshitting," his sister recommended that he stay at his girlfriend's house in Brooklyn so that there would be an opportunity to "clear the air."  (Id. at 227, 249, 263).  Murphy's sister was hoping that R.J., who knew Silver, would be able to serve as a mediator.  (Id. at 249).

Before leaving the apartment that morning, Murphy packed a "medium sized" black duffel bag.  (Id. at 232-33, 251-52).  R.J. left the apartment with Murphy, but soon returned.  (Id. at 233).

Later that same morning, Silver and Pogue were asleep in their apartment when they were awakened, at around 7:30 a.m., by loud banging on their front door.  (Id. at 748, 754, 756-57).  Eventually, the door burst open and Murphy ran into the apartment wielding a pump-action shotgun.  (Id. at 758-61).  Standing near the bedroom doorway, Murphy shouted at Silver, "Where's the piece?  Where is the fucking piece?"  (Id. at 759-62).  After Silver pushed Pogue out of harm's way, Murphy aimed the shotgun at Silver and fired.  (Id. at 762, 764-65).  Murphy then entered the bedroom and shot Silver again at close range.  Although Tyson testified that Silver had a black .45 caliber handgun, Murphy ran out of the apartment without recovering it.  (See id. at 435-36, 765-68).

Because there was no operable phone in the apartment, Pogue went downstairs to call for help using a pay phone.  (Id. at 769).  As she ran to the street, she observed Murphy one flight ahead of her on the staircase.  (Id.).  Once outside, Pogue saw

Murphy and another man running up the street carrying a duffel bag approximately two feet long.  (Id. at 770-72).  When she subsequently reached the "911" operator, Pogue described the shooter as approximately five feet, nine inches tall with light skin and a long haircut.[3]  (Pet'r's Br. at 35).

Police officers responding to the "911" call noticed that the front door to Silver's apartment appeared to have been pushed or kicked in and that the lock was hanging from the door frame.  (T. 100, 118-19, 601, 774-75).  In the apartment, Police Officer Dennis Concepcion ("P.O. Concepcion") and Pogue knelt by Silver's side and heard Silver say the word "Powerful."  (Id. at 101, 104, 777-78).  When Pogue asked who that was, Silver whispered something like R.J.'s "sister's brother" or "brother's sister." (Id. at 777-78).  In response to further questions by P.O. Concepcion, Silver confirmed that the name of the shooter was "Powerful" and that he knew him from the neighborhood.  (Id. at 104, 109).  At that point, P.O. Concepcion asked Pogue for something to write on, and she handed him a cardboard spaghetti box, which he used to record the information.  (Id. at 104-05, 779).

After Silver was taken away in an ambulance, the police drove Pogue around the neighborhood in an attempt to locate the perpetrator.  (Id. at 839-40).  While they were driving, Pogue saw Silver's sister, Sharon Tyson, who joined them in the squad

---

[3]        The "911" tape was played for the jury immediately before the People rested.  (T. 861-63).  The transcript of the portion of that call in which Pogue described the shooter is reproduced in Murphy's brief to the Appellate Division.  (Pet'r's Br. at 35-36).

9

car and accompanied Pogue to the precinct.  (Id. at 422, 635, 839, 843-44).  There, P.O.

Concepcion prepared a complaint report in which he recorded Pogue's description of the

shooter as a Black male with short brown hair who was six feet tall and weighed 230

pounds.  (Id. at 105-07).

The next day, Detective Carlton Berkley ("Det. Berkley")[4] went to

Murphy's apartment.  The detective left a message with Murphy's sister, Justine, asking

that Murphy call him.  (Id. at 234-35).  The following day, Justine told her brother that the

police were looking for him and gave him Det. Berkley's pager number.  (Id. at 235-36).

Eventually, Murphy called Det. Berkley and asked whether he was calling about Silver.

When Det. Berkley confirmed that he was, Murphy inquired, "Is he dead?"  (H. 226;

Pet'r's Br. at 25; Resp't's Br. at 21).[5]  Det. Berkley told him that Silver was seriously

injured, but still alive.[6]  (H. 227; Pet'r's Br. at 25; Resp't's Br. at 21).

---

[4]      Det. Berkley's name is spelled two different ways in the transcript.  I have
adopted the spelling he gave during his testimony at the pretrial hearing.  (See H. 221).

[5]      The pages of the trial transcript reflecting Det. Berkley's conversation with
Murphy are not part of the copy filed with this Court.  Nevertheless, the briefs on appeal
establish that there is no dispute regarding the contents of this conversation.  (See Pet'r's Br. at
25; Resp't's Br. at 20-21).

[6]      After Murphy's counsel suggested during her summation that Murphy had
cooperated fully with Det. Berkley, Justice FitzGerald concluded that the argument was
misleading because Murphy had declined to come to the precinct, a fact counsel had successfully
kept from the jury by objecting during Det. Berkley's direct examination.  (T. 981).  To correct
this false impression, Justice FitzGerald induced counsel to enter into a stipulation which was
read to the jury immediately before the prosecutor's summation.  (Id. at 995).  The stipulation
indicated that Murphy "was given an opportunity to come down to the precinct, but he did not
go."  After reading the stipulation to the jurors, Justice FitzGerald cautioned them that "nobody

(continued...)

10

Silver died at Harlem Hospital on March 26, 1998. (T. 396-97, 595). The next day, police officers executed a search warrant at Murphy's apartment but did not find a shotgun. They did, however, locate a holster for a handgun. (Id. at 608-11).

2.    Defense Case

Murphy did not present a defense case.

3.    People's Summation

In the course of his summation, the prosecutor discussed the events of May 23, 1998, arguing that Murphy's

> actions before the crime show you his intent. He is packing a bag; packing clothes, boots, shoes. And he grabs the shotgun, sawed-off pump action shotgun. . . .
>
> Now is he taking the shotgun because he is worried about taking the train? Is he removing the shotgun because he is worried about Justine's children? There is no evidence of that . . . . [I]t is very clear that his own path shows what he intends to do prior to his way to Brooklyn.

(Id. at 1012-13). When defense counsel objected that there was no evidence that Murphy had taken the shotgun from the apartment, Justice FitzGerald responded, "if the jury can draw these conclusions that are logical, they are permitted to. He can argue it but it is up to the jury." (Id. at 1013-14).

Shortly thereafter, when the prosecutor observed that "we know that [Murphy] leaves sometime around 7:00 o'clock in the morning, and the shooting just

---

[6](...continued)
has an obligation either to return a call or come down to the precinct." (Id.).

happens to be sometime around 7:30 in the morning," defense counsel objected on the ground that there was no evidence that Murphy left his apartment at 7:00 a.m.  (Id. at 1014).  After Justice FitzGerald conceded that he could not "recall the testimony," the prosecutor interjected that he "rel[ied] on the testimony," and that if the jurors "[thought] for some reason it is an earlier time," they should "consider it accordingly."  (Id. at 1014-15).

The prosecutor also noted during his summation that the shooter's identity "appears to be the only [issue] being challenged in this trial."  (Id. at 1027).  With respect to that issue, the prosecutor asked the jury to

> consider [Murphy's] own statements . . . when he speaks to
> [Det. Berkley] the next day or day afterwards.  What does he
> say?  "Are you calling me about Andre?  Is he dead?"

(Id. at 1035).  The prosecutor further argued that Murphy's "statements to the detectives remove[] any doubt he knows what he did" because "he knows [w]hat the police officers are asking him and he says, 'Is he dead?'"  (Id.).  Continuing in the same vein, the prosecutor argued, near the end of his summation, that Murphy must have been the shooter because it was unlikely that Pogue "in her sleepy, hysterical, induced haze just happens to hear incorrectly 'Powerful, R.J.'s girlfriend's brother.'  And just by sheer coincidence, bad luck, wrong person, [mis]ID, this defendant just happens to be R.J.'s girlfriend's brother."  (Id. at 1049).  Although this misstated the facts, defense counsel did not object.  (See id.).

12

4.   <u>Jury Charge</u>

The jury was asked to consider three charges:  Burglary in the First Degree; Murder in the First Degree; and Murder in the Second Degree.  (<u>Id.</u> at 1081-82, 1087, 1091-92, 1098).  With respect to the burglary count, the court instructed the jury that:

> The crime of burglary is separate and distinct from any crime which a person intends to commit or commits within the dwelling itself.  The crime of burglary is complete when a person knowingly and unlawfully enters a dwelling with the intent at that time to commit a crime inside, whether or not he actually ever commits any crime.
>
> Moreover, the People need not prove with specificity the actual crime the defendant intended to commit inside the dwelling.  The People need only prove that the defendant intended to commit some crime inside.  It doesn't matter what crime a person intends to commit, from simple theft all the way up to hurting someone, or even killing[.  A]s long as the People prove that at the time of an unlawful entry the person intended to commit some crime inside, the People have satisfied this element.

(<u>Id.</u> at 1084; <u>see also</u> <u>id.</u> at 1094-95).

The court further instructed the jury with respect to the first degree murder count that the killing must have been "in furtherance of the commission of the burglary." (<u>Id.</u> at 1089).  Justice FitzGerald explained that this meant that the death had to have "occurred in connection with the burglary or . . . in some other way [been] related to the burglary."  (<u>Id.</u> at 1089-90).

5.     Verdict

On June 26, 2000, after deliberating briefly, the jurors found Murphy guilty of Burglary in the First Degree and Murder in the First Degree.  (Id. at 1122-24).  There consequently was no need for them to consider the lesser-included offense of Murder in the Second Degree.  (See id. at 1091, 1095-96).

6.     Sentencing

On July 13, 2000, Justice FitzGerald sentenced Murphy to imprisonment for a term of twenty-five years to life on the Murder in the First Degree count.  (S. 42). Before imposing sentence, the Justice explained that he was dismissing the charge of Burglary in the First Degree pursuant to Section 300.40(3)(b) of the New York Criminal Procedure Law ("CPL"), which provides that "[a] verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser count submitted."  (Id. at 9-11).

D.     Subsequent Procedural History

1.     Direct Appeal

Murphy appealed his conviction to the Appellate Division, First Department, claiming that (a) his guilt was not proved beyond a reasonable doubt and his conviction was against the weight of the evidence, (b) the court improperly denied defense counsel's challenge of a juror for cause, (c) the lineup identification was unduly suggestive, (d) the prosecutor committed misconduct during his summation, and (e) his

conviction should have been reduced to Murder in the Second Degree because the murder was not "in furtherance" of the burglary. (Pet'r's Br. at 33, 44, 53, 59, 68).

On November 18, 2003, the Appellate Division unanimously affirmed Murphy's conviction. People v. Murphy, 1 A.D.3d 184 (1st Dep't 2003). In its decision, the Appellate Division found that Murphy's conviction was "based on legally sufficient evidence and was not against the weight of the evidence." Id. The court also held that the trial court had properly denied Murphy's application to remove juror Lu for cause because "she ultimately gave a specific and unequivocal assurance of impartiality." Id. With respect to the lineup, the court found that the identification of Murphy was not unduly suggestive because any discrepancy in the body size of the participants was ameliorated through the use of cardboard screens. Id. at 184-85. The court further held that Murphy's claim regarding the skin color of the lineup participants was unpreserved. Although the court therefore declined to review that claim, it also noted that the claim would have been rejected if it had been reached. Id. at 185. Finally, the court summarily rejected Murphy's claims regarding the alleged prosecutorial misconduct in summation and need to reduce the murder charge to Murder in the Second Degree. Id.

By motion dated December 2, 2003, Murphy sought to reargue the Appellate Division's rejection of several of his claims on the ground that its decision constituted manifest error. (Ex. F). Murphy also argued that he was entitled to have his conviction reduced to Murder in the Second Degree in light of People v. Cahill, 2 N.Y.3d

15

14 (2003), a case decided one week after the Appellate Division affirmed his conviction. (Id. ¶¶ 8-9). In Cahill, the New York Court of Appeals held that if a defendant enters a building intending to commit only a murder, "that intent cannot be used both to define the burglary and at the same time bootstrap the second degree (intentional) murder to a capital crime." Cahill, 2 N.Y.3d at 65. As the court explained, if that were permissible, contrary to the Legislature's intent, "life or death [would] hinge on whether a defendant engaged in conduct that simply enabled the intended murder and had no point of its own." Id.

On October 21, 2004, notwithstanding the Cahill decision, the Appellate Division summarily denied Murphy's reargument motion. (Ex. I). Thereafter, on February 11, 2005, Murphy's application for leave to appeal that denial, (Ex. J), was summarily denied by Associate Judge Susan Phillips Read of the Court of Appeals, People v. Murphy, 4 N.Y.3d 801 (2005). Murphy did not file a petition for a writ of certiorari.

2.    Motion to Vacate Judgment of Conviction

On or about January 20, 2006, Murphy filed a pro se motion to vacate his judgment of conviction pursuant to CPL § 440.10(1)(h). (Ex. M). In his papers, Murphy repeated his claims regarding juror Lu and his conviction on the first degree murder charge, but also added three new claims, contending that his constitutional rights were violated because (a) the prosecutor withheld exculpatory evidence, (b) Justice FitzGerald

16

improperly charged the jury that the People had satisfied an element of the crime of first degree burglary, and (c) his trial counsel was ineffective.  (Id.).

On July 7, 2006, Justice FitzGerald denied Murphy's motion.  (Ex. O).  In his order, the Justice noted that Murphy's juror challenge and conviction reduction claims were barred by CPL § 440.10(2)([a]), because they had been determined by the Appellate Division on the merits, and that his Brady and jury charge claims were barred by CPL § 440.10(2)(c), because they were record-based and Murphy had demonstrated "no reason, let alone a justifiable one, for the failure to raise the issue[s] on appeal."  (Id. at 2).  Justice FitzGerald also rejected Murphy's claim that his trial counsel was ineffective, stating that she had succeeded in suppressing his post-arrest statement, had "put forth a coherent defense strategy," had made "cogent" objections, and had "advocated doggedly for [Murphy], even through the sentencing proceeding where she successfully opposed the People's recommendation that [he] be sentenced to life in prison without parole."  (Id. at 3).  Justice FitzGerald also rejected Murphy's claim that he had an alibi witness whom counsel had failed to call because Murphy had not made any sworn allegations establishing that such a witness existed or would have been helpful.  (Id.).  The Justice further observed that it "would have been utter folly" to call character witnesses, as Murphy urged, because they would have been "exposed . . . to cross examination about their knowledge of [Murphy's] extensive criminal history."  (Id. at 4).

17

On October 24, 2006, the Appellate Division denied Murphy's application to appeal the denial of his motion to vacate his conviction. (Resp't's Answer in Opp. to Pet. ¶ 16).

### 3. Habeas Petition

Murphy's Petition is dated January 20, 2006, and was received by the Pro Se Office of this Court on February 6, 2006. (See Docket No. 2). The Petition therefore is timely. See 28 U.S.C. § 2244(d)(1)(A) (affording defendant one year from "the date on which the judgment became final by the conclusion of direct review" to file a petition), (d)(2) (excluding time periods during which applications for collateral review are pending).

In his Petition, Murphy reasserts each of the claims that he previously raised on direct appeal and in his CPL § 440.10 motion.

## III. Discussion

### A. Procedurally-Barred Claims

Murphy arguably has fully exhausted his Brady and jury instruction claims by raising them in his CPL § 440.10 motion and seeking leave to appeal the denial of those claims to the Appellate Division. See CPL § 450.15(1) (defendant may appeal the denial of a CPL § 440.10 motion to the Appellate Division only if that court issues a certificate granting leave to appeal). Nonetheless, even when a petitioner presents a colorable constitutional claim that is fully exhausted, a federal court is precluded from

reviewing the claim if the state court's prior denial of it rested on an adequate and independent state ground.  E.g., Lee v. Kemna, 534 U.S. 362, 375 (2002); Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81 (1971).  A procedural default qualifies as such an adequate and independent state ground, Harris, 489 U.S. at 262, unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).  Moreover, when the last court to issue a reasoned decision relies on a state procedural bar, a federal habeas court will presume that subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In his decision denying the CPL § 440.10 motion, Justice FitzGerald expressly held that Murphy's Brady and jury charge claims were procedurally barred. (Ex. O at 1-2).  As the Justice explained, both issues were "fully [handled] in the record" and "should have been raised on [Murphy's direct] appeal."  (Id. at 2).  This conclusion plainly is correct with respect to Murphy's Brady claim because there was considerable testimony about the spaghetti box; indeed, the court gave the jury an adverse inference instruction regarding its loss.  (See T. 104-05, 141, 162-63, 779, 1062-64).  The jury instruction that Murphy seeks to contest similarly was a matter of record.  (Id. at 1084).

In its decision regarding Murphy's direct appeal, the Appellate Division also held that Murphy's complaints about aspects of the pretrial lineup, other than the disparate sizes of the participants, were unpreserved.  Murphy, 1 A.D.3d at 185.  Although Murphy later sought to reargue that court's affirmance of his conviction, he did not contest this determination, nor could he since the transcript of the Wade hearing shows that Murphy's claims relating to the lineup did not relate to the skin tones of the participants.

Accordingly, because the state courts relied upon adequate and independent state grounds for the denial of these claims, this Court may not consider these three unpreserved claims unless Murphy can show both cause for his default and actual prejudice, or that the failure to consider his claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  The circumstances giving rise to cause include (a) interference by government officials which makes compliance impracticable, (b) situations in which the factual or legal basis for a claim was not reasonably known by counsel, and (c) ineffective assistance of counsel.  See Murray, 477 U.S. at 488; Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994).  A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a

substantial injurious effect on the petitioner's case such that he was denied fundamental fairness. <u>Reyes v. New York</u>, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999). Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001).

In his papers, Murphy makes none of these required showings. The Court therefore lacks jurisdiction to consider his procedurally-barred claims.[7]

B.    <u>Murphy's Remaining Claims</u>

1.    <u>Standard of Review</u>

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993). Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated. <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

---

[7]    Although Murphy contends that his trial counsel was ineffective, he does not allege, nor is there any reason to believe, that his appellate counsel suffered from the same infirmity. Accordingly, his ineffective assistance of counsel claim cannot serve as a justification for his failure to assert these defaulted claims on direct appeal.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. <u>Id.</u> at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" <u>Jones</u>, 229 F.3d at 119 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

22

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

### 2. Weight and Sufficiency of the Evidence

Murphy claims that there was insufficient evidence to convict him of Murder in the First Degree and that his conviction on that charge was against the weight of the evidence. (Pet'r's Br. at 33-44). A petitioner's claim that his conviction was contrary to the weight of the evidence is not cognizable on federal habeas review. See Givens v. Burge, No. 02 Civ. 0842 (JSR)(GWG), 2003 WL 1563775, at *10 (S.D.N.Y. Mar. 4, 2003) (collecting cases). On the other hand, the sufficiency of the evidence used to convict a defendant is an issue that a habeas court may address. A habeas petitioner challenging the sufficiency of the evidence nevertheless bears a "very heavy burden."

23

Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995) (internal quotation marks omitted).

To prevail, the petitioner must show that "no rational trier of fact could have found proof

of guilt beyond a reasonable doubt." Bossett, 41 F.3d at 830 (quoting Jackson v.

Virginia, 443 U.S. 307, 324 (1979)). In considering such a sufficiency claim, a habeas

court must weigh the evidence in the light most favorable to the prosecution and draw all

permissible inferences in its favor. Jackson, 443 U.S. at 326.

A sufficiency claim therefore does not permit the reviewing court to

redetermine the credibility or reliability of witnesses or substitute its view of the evidence

for that of the trier of fact. See Marshall v. Lonberger, 459 U.S. 422, 434 (1983);

Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). Rather, insofar as there is evidence

from which the jury could have drawn an inference favorable to the accused but chose not

to, the court must "defer to . . . the jury's choice of the competing inferences." United

States v. Kinney, 211 F.3d 13, 18 (2d Cir. 2000) (quoting United States v. Morrison, 153

F.3d 34, 49 (2d Cir. 1998)). For this reason, "the testimony of a single, uncorroborated

eyewitness is generally sufficient to support a conviction." United States v. Danzey, 594

F.2d 905, 916 (2d Cir. 1979); see also Edwards v. Jones, 720 F.2d 751, 755 (2d Cir.

1983) (following Danzey even though the testimony and character of the sole witness

who directly implicated the petitioner were "less than inspiring"); Means v. Barkley, No.

98 Civ. 7603 (DLC), 2000 WL 5020, at *4 (S.D.N.Y. Jan. 4, 2000) (applying Danzey and

noting that habeas court may set aside conviction only if testimony is "incredible as a matter of law").

Murphy claims that the evidence adduced at trial was legally insufficient due to such "glaring inconsistencies" as Pogue's inaccurate description of Murphy to the "911" operator. (Pet'r's Br. at 33-36). However, Pogue obviously placed that call at a time when she was quite distraught. Furthermore, by the time P.O. Concepcion prepared his complaint, Pogue had corrected her description of the shooter, stating that he was six feet, four inches tall and weighed 230 pounds. (T. 106). She also identified Murphy both in a lineup and in open court. (Id. at 749, 781). Accordingly, notwithstanding Pogue's initial description, there was more than enough evidence to establish that Murphy was the shooter.

Murphy further argues that Tyson's testimony regarding R.J.'s shotgun was insufficient to connect Murphy to the murder weapon. (Pet'r's Br. at 41-42). Pogue testified, however, that Murphy wielded a pump-action shotgun. (T. 761-67). This testimony alone, if believed, was sufficient to establish that Murphy brought a shotgun to Silver's apartment. The People did not have to establish that the murder weapon was R.J.'s shotgun. Nevertheless, the jury could have inferred as much from (a) Tyson's testimony that he was shown a shotgun at R.J.'s apartment, (b) Justine's testimony that Murphy left her apartment with a duffel bag, (c) Pogue's testimony that the shooter and

his accomplice were carrying a duffel bag as they fled, and (d) the fact that the shotgun could not be found in Murphy's apartment after the shooting.

In sum, there is no factual or legal basis for Murphy's insufficiency-of-the-evidence claim.

### 3. Voir Dire

Murphy also contends that the trial court improperly forced him to exercise a peremptory challenge application to have Lu removed for cause. (Pet'r's Br. at 44-53).

Under New York law, a juror may be challenged for cause when she "has a state of mind that is likely to preclude [her] from rendering an impartial verdict based upon the evidence adduced at the trial." CPL § 270.20(1)(b) (McKinney 2002). In such circumstances, the court must excuse the juror "unless [she] states unequivocally on the record that . . . she can be fair and impartial." People v. Chambers, 97 N.Y.2d 417, 419 (2002); People v. Johnson, 94 N.Y.2d 600, 610-14 (2000). One means of doing so is through an "expurgatory oath" in which the juror declares "to the satisfaction of the court that [her] opinions [will] not influence [her] verdict, and that [she can] render an impartial verdict according to the evidence." St. Lawrence v. Scully, 523 F. Supp. 1290, 1299 (S.D.N.Y. 1981) (quoting People v. Branch, 46 N.Y.2d 645, 650 (1979)). Although the text of the expurgatory oath once was codified, a particular incantation is no longer required. Id.; People v. Culhane, 33 N.Y.2d 90, 104 n.2 (1973).

As the federal and state courts recognize, trial courts have broad discretion in determining juror challenges because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." Ristaino v. Ross, 424 U.S. 589, 595 (1976) (quoting Rideau v. Louisiana, 373 U.S. 723, 733 (1963)); United States v. Perez, 387 F.3d 201, 205 (2d Cir. 2004); United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997); People v. Williams, 63 N.Y.2d 882, 885 (1984); People v. Brown, 35 A.D.3d 627, 628 (2d Dep't 2006). A reviewing court therefore should be reluctant to second-guess a trial judge's conclusions, which are made after hearing and observing the potential juror. See, e.g., Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981); United States v. Ploof, 464 F.2d 116, 118 n.4 (2d Cir. 1972) ("There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury.").

In this case, Lu's initial statements suggested the possibility of bias. (See V.D.II 65-66). Nevertheless, when Justice FitzGerald requested a "100 percent assurance" that Lu would not find Murphy guilty unless the People proved his guilt beyond a reasonable doubt, her unambiguous response was "Ye[s]." (Id. at 74). In light of that statement, Lu's earlier responses (which included such waffle words as "think," "might," or "try") are insufficient to show that Justice FitzGerald abused his discretion by

concluding that she could be fair and impartial.  See Chambers, 97 N.Y.2d at 419 (citing People v Blyden, 55 N.Y.2d 73, 79 (1982)).

In any event, even if Justice FitzGerald erred in denying Murphy's for-cause challenge, thereby forcing Murphy to exercise a peremptory challenge to remove Lu from the panel, his right to a fair trial could not have been violated as long as his case was heard by an impartial jury.  United States v. Martinez-Salazar, 528 U.S. 304, 307, 317 (2000); see id. at 313 ("So long as the jury that sits is impartial, . . . the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.") (quoting Ross v. Oklahoma, 487 U.S. 81, 88 (1988)); see also Perez, 387 F.3d at 208 ("Since appellant does not contest that the jury ultimately impaneled was fair and impartial, his allegation of error does not implicate his constitutional right to a fair trial.") (emphasis omitted).

In his habeas petition, Murphy does not allege that any of the jurors who decided his case was biased.  Accordingly, the failure to excuse Lu for cause did not violate his federal constitutional rights, even if he had to exercise a peremptory challenge to achieve that result.  See Perez, 387 F.3d at 208.

4.     Lineup Identification

Murphy also claims that the composition of the lineup at which he was identified was unduly suggestive because he was much bigger than the other participants. (See Pet'r's Br. at 53-58).  Although the Constitution prohibits the introduction of

identifications procured by means of "unduly suggestive" lineups, the Due Process Clause "does not require that an accused be surrounded at a line-up by persons nearly identical in appearance." Love v. Kuhlman, No. 99 Civ. 11063 (DLC)(RLE), 2001 WL 1606759, at *7 (S.D.N.Y. Dec. 12, 2001) (citing United States v. Reid, 517 F.2d 953, 965 n.15 (2d Cir. 1975)); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000) ("Police stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required.") (citation and internal quotation marks omitted).  Thus, "even a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." United States v. Mohammed, 27 F.3d 815, 821 (2d Cir. 1994) (quoting United States v. Simmons, 923 F.2d 934, 950 (2d Cir. 1991)); see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony . . . .").

To prevail on his claim, Murphy consequently must establish that the pretrial identification procedures were so suggestive that they created "a very substantial likelihood of irreparable misidentification." Mohammed, 27 F.3d at 821 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  The factors that a court should consider in determining the likelihood that the defendant was misidentified include "[(a)] the opportunity of the witness to view the criminal at the time of the crime, [(b)] the witness' degree of attention, [(c)] the accuracy of the witness' prior description of the

criminal, [(d)] the level of certainty demonstrated by the witness at the confrontation, and [(e)] the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972). "A good or poor rating with respect to any one of these factors will generally not be dispositive." United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992). Rather, "[i]n each case, the factors must be assessed in light of the totality of the circumstances. Id. at 378.

Here, each of the relevant factors confirms the reasonableness of Justice FitzGerald's conclusion that there was "simply no possibility that anything done by the police would have led to an unreliable or mistaken identification." (Ex. A at 11). At the outset, Pogue undoubtedly had an adequate opportunity to view Murphy at the time of the shooting since it occurred in close proximity to where she was standing and she later pursued Murphy down the staircase and into the street. (See T. 759-73). Inasmuch as she was squarely within the zone of danger throughout much of the incident, it further is clear that Pogue paid careful attention to Murphy from the time he entered her apartment to the time he fled. There also can be no serious doubt as to the accuracy of her lineup identification or the freshness of her observations since, as even Murphy concedes, "Pogue had identified [him] in a facial photo array including similar-complexioned men three days after the shooting." (Pet'r's Br. at 57). Finally, it is clear that Pogue recalled Murphy from the incident, and was not unfairly influenced by any disparity in the size of

the lineup participants, since she "lost [her] composure" after identifying Murphy as the shooter.  (T. 618).

In sum, although the composition of the lineup may not have been ideal, Murphy has not shown that Justice FitzGerald's decision rejecting his pretrial identification claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  He therefore is not entitled to habeas relief on this ground.

5.    Summation Misconduct

Murphy next argues that the prosecutor engaged in misconduct so severe as to deny Murphy a fair trial by virtue of three statements made during his fifty-five page closing argument.  (Pet'r's Br. at 59-68).

A claim of prosecutorial misconduct during summation requires a court to consider "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  The issue is not simply whether the prosecutor's comments were "undesirable or even universally condemned."  Id.  Accordingly, a mere showing of prosecutorial misconduct does not entitle a petitioner to habeas relief.  Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).  Rather, there must be a showing that the petitioner "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious

31

effect or influence in determining the jury's verdict."  Id.  In determining whether the petitioner suffered such prejudice, a court must consider:  "([a]) the severity of the prosecutor's conduct; ([b]) what steps, if any, the trial court may have taken to remedy any prejudice; and ([c]) whether the conviction was certain absent the prejudicial conduct."  Id. (citing Gonzalez, 934 F.2d at 424).

Murphy first complains that the prosecutor "misrepresented" the facts by suggesting that Murphy's inquiry as to whether Silver was dead constituted an implied admission that he "kn[ew] what he did."  (Pet'r's Br. at 61 (citing T. 1035)).  In Murphy's view, this inference was unfair because "the prosecutor knew that [Murphy] could easily have learned of the shooting" through his sister or others in the neighborhood.  Indeed, as he notes, Det. Berkley acknowledged at the pretrial hearing that news of Silver's death "had circulated" by the time Murphy called the detective.  (Id.).  Whatever the state of knowledge in the neighborhood may have been, there was no direct evidence at either the hearing or the trial that Murphy had been told about Silver's condition.  Moreover, the testimony of Murphy's sister established that Murphy was in Brooklyn, not the area where the shooting occurred, at the time of the call.  (T. 235).  The prosecutor's argument consequently was proper.  Even if that were not the case, as Justice FitzGerald correctly observed, there was little likelihood that the jurors would have been misled by the prosecutor's remarks because they had heard the testimony indicating that others learned

of the shooting shortly after it occurred and could therefore draw their own conclusions about the import of Murphy's question to the detective.  (Id. at 1053).

Murphy also complains that the prosecutor improperly urged the jurors to draw factual inferences about the events leading up to the shooting which were not warranted by the evidence.  (Pet'r's Br. at 64).  Specifically, Murphy alleges that there was no evidence to support the prosecutor's contention that Murphy left his apartment at 7:00 a.m. with a shotgun.  (Id.).

The prosecutor stated during his summation that Murphy's "actions before the crime show you his intent.  He is packing a bag; packing clothes, boots, shoes.  And he grabs the shotgun, sawed-off pump action shotgun."  (T. 1012).  After the court overruled an objection that there was "no evidence that he took the shotgun" on the ground that "it [was] up to the jury," the prosecutor continued, "[W]e know that he leaves sometime around 7:00 o'clock in the morning, and the shooting just happens to be sometime around 7:30 in the morning."  (Id. at 1013-14).  In response to an objection that there was "no evidence [Murphy] left at 7:00 in the morning," the prosecutor told the jury, "I rely on the testimony.  If you think for some reason it is an earlier time, consider it accordingly. . . .  We know the defendant  – let's just say he leaves early in the morning." (Id. at 1014-15).

As the Supreme Court long ago stated, "[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would

stand." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 243 (1940) (quoting

Dunlop v. United States, 165 U.S. 486, 498 (1897)).  Here, even if there was no evidence

that Murphy left the apartment he shared with his sister at 7:00 a.m., his sister Justine

unequivocally testified that he had entered the apartment early in the morning and

subsequently left with a packed duffel bag.  (T. 228, 232-33).  Whether Murphy left at

5:00 a.m., 6:00 a.m., or 7:00 a.m. was of little, if any significance.  Accordingly, even if

the prosecutor misspoke in this respect, his error could not have affected the outcome of

the trial.

In the course of discussing the events of May 23, the prosecutor also argued

that Murphy left his apartment with R.J.'s sawed-off shotgun.  While there was no direct

testimony to that effect, the prosecution is entitled to "broad latitude in the inferences it

may reasonably suggest to the jury during summation."  United States v. Cohen, 427 F.3d

164, 170 (2d Cir. 2005) (quoting United States v. Edwards, 342 F.3d 168, 181 (2d Cir.

2003)).  In that connection, the People established through the testimony of Tyson that

there was a sawed-off pump action shotgun in Murphy's apartment in April 1998.  (T.

437-40).  The People further established that the shotgun was no longer in that apartment

a few days after the shooting.  (Id. at 610).  Finally, Pogue testified that Murphy shot

Silver with a sawed-off pump action shotgun.  (Id. at 760-62).  From this evidence, it

certainly was reasonable to infer, and therefore for the prosecutor to argue, that Murphy

had packed the shotgun in the duffel bag that he was carrying when he left his apartment on the morning of May 23, 1998.

Murphy's final complaint with respect to the prosecutor's summation is that the prosecutor falsely claimed that Silver had stated that his assailant was "R.J.'s girlfriend's brother." This misstatement, in turn, permitted the prosecutor to argue to the jury that it could not be a "sheer coincidence" that Murphy "just happen[ed]" to fit Silver's description. (Pet'r's Br. at 66 (citing T. 1048-49)). Although Pogue recalled during her testimony that Silver had said something about R.J and used the words "sister" and "brother," she did not in fact testify about a girlfriend. Rather, according to Pogue's direct testimony, Silver said "'Powerful' . . . [and then h]e said 'R.J.' – I can't remember if he said sister's – R.J.'s sister's brother. I can't remember exactly." (T. 777). On cross-examination, Pogue testified further that Silver had said, "Powerful, R.J.'s sister," but she conceded that she could not "remember exactly how it went." (Id. at 836).

Perhaps the best indication that the prosecutor's misstatement concerning a girlfriend lacked the force that Murphy now seeks to ascribe to it is the fact that his defense counsel, who was not shy about objecting during the prosecutor's summation, raised no protest whatsoever when the prosecutor made this remark. Furthermore, shortly after the prosecutor completed his summation, Justice FitzGerald reminded the jurors that it was their recollection of the evidence that controlled and that the attorneys' summations were not evidence. (Id. at 1057-58). In any event, even if the prosecutor's summation

mangled the relationship between Murphy and R.J., the uncontested testimony of both

Pogue and P.O. Concepcion established that Silver's assailant was known as "Powerful."

Since the undisputed evidence further showed that this was Murphy's nickname, precisely

how "Powerful" was related to R.J. was largely irrelevant.

The prosecutor's summation, while admittedly not perfect, therefore did not

deprive Murphy of a fair trial.

### 6. Reduction to Second Degree Murder

Murphy also claims that his first degree murder conviction should be

reduced to second degree murder because the evidence did not show that he killed Silver

in furtherance of a burglary. (Pet'r's Br. at 68-70). In Murphy's view, because he

committed a burglary in furtherance of a murder, not a murder in furtherance of a

burglary, his conviction on the first degree murder charge was improper.

In his direct appeal and motion for reargument, Murphy predicated this

claim principally on state law. (See Pet'r's Br. at 68-70; Ex. F ¶ 8). Nonetheless, he also

argued that his conviction violated the Eighth Amendment. (See Pet'r's Br. at 69-70

(citing Godfrey v. Georgia, 446 U.S. 420, 428 (1980), and Gregg v. Georgia, 428 U.S.

153, 189 (1976))). Both contentions are unavailing.

Turning first to the constitutional claim, in Godfrey and Gregg the Supreme

Court was asked to consider a Georgia statute which made murder a capital offense if the

prosecution established beyond a reasonable doubt that the offense was "outrageously or

wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." In <u>Gregg</u>, the Supreme Court held that this statute was not unconstitutional on its face, in part because the Georgia state supreme court was required to review "every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, [and] whether the evidence supports the findings of a statutory aggravating circumstance." 428 U.S. at 204-06 (opinion of Stewart, Powell, & Stevens, JJ.).

Four years later, in <u>Godfrey</u>, the Supreme Court was confronted with a capital case involving none of the aggravating circumstances that the Georgia supreme court had found satisfied the Georgia statute in prior cases. As the Supreme Court succinctly explained, "[t]he petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder." <u>Godfrey</u>, 446 U.S. at 433. Accordingly, because there was "no principled way to distinguish [the petitioner's] case, in which the death penalty was imposed, from the many in which it was not," the Court found that the sentence had not been shown to be "based on reason rather than caprice or emotion." <u>Id.</u> (quoting <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977)).

In New York, the legislature has created a statutory scheme in which one of the factors that can elevate intentional Murder in the Second Degree to Murder in the First Degree is the killing of the victim "while the defendant was in the course of

committing or attempting to commit and in furtherance of . . . burglary in the first degree or second degree." N.Y. Penal Law § 125.27(1)(a)(vii) (McKinney 2004). The crime of burglary in the second degree, in turn, requires the defendant (insofar as relevant) to have entered or unlawfully remained in a building with intent to commit a crime therein while armed with a deadly weapon. Id. § 140.25(1)(a). That crime further is elevated to burglary in the first degree if the building is a dwelling. Id. § 140.30(1). Since all three statutes require proof of specific factual elements, they can scarcely be characterized as suffering from such a lack of clarity that a jury might find a defendant guilty of an enhanced charge arbitrarily and capriciously. Consequently, even if the Supreme Court's case law applicable to capital crimes were shown to be applicable to the charges against Murphy in this case, it is clear that any additional elements necessary to establish Murphy's guilt on the first degree murder charge were not so vague or ambiguous as to render his conviction violative of the Eighth Amendment.

Murphy's conviction reduction claim therefore amounts to little more than an assertion that the New York courts have misinterpreted New York law. However, even the state courts disagree as to whether a burglary committed solely in furtherance of a murder can elevate a murder to a capital crime. Compare State v. Tillman, 750 P.2d 546, 564-65 (Utah 1987) (first degree murder conviction upheld based on proof that the murder took place in the course of a burglary intended to help achieve the killing), and Smith v. State, 499 So.2d 750, 754 (Miss. 1986) (same), with Williams v. State, 818 A.2d

906, 908, 913 (Del. 2002) (burglary with no objective other than the murder not a basis for elevating the crime to a capital offense), and Parker v. State, 731 S.W.2d 756, 758-59 (Ark. 1987) (same). "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treatises of the United States." Id. Murphy's claim that the state court misinterpreted PL § 125.27(1)(a)(vii) does not raise such a claim.

Murphy principally bases his conviction reduction claim on the decision of the New York Court of Appeals in People v. Cahill. In that case, the defendant entered his wife's hospital room after visiting hours and killed her by pouring potassium cyanide in her mouth. Id. at 36-37. After the defendant was convicted of first degree murder, on the theory that he had intentionally murdered his wife in the course of and in furtherance of a burglary, the jury recommended the death penalty. Id. at 37-38. The Court of Appeals nevertheless directed that the defendant's conviction be reduced from first degree murder to second degree murder because the "[d]efendant's trespass on the hospital premises was merely a prerequisite to his committing the murder – an enabling measure that had no purpose or substance other than to serve his only goal, to kill his victim." Id. at 70. As the Court of Appeals observed:

> To permit a jury to choose who will live and who will die on
> the basis of whether in the course of committing a first degree
> murder the defendant happens to engage in ancillary conduct
> that technically constitutes robbery or one of the other listed

> felonies would be to revive "the risk of wholly arbitrary and
> capricious action" condemned by the high court plurality in
> <u>Gregg</u>.

<u>Id.</u> at 71 (citation omitted).

In this case, unlike <u>Cahill</u>, there is ample evidence to support a finding that

murder was <u>not</u> Murphy's sole objective when he broke down the front door to Silver's

apartment. Indeed, Murphy's very first statement after entering the apartment was,

"Where's the piece?" (T. 761-62). This, combined with Murphy's earlier expressions of

concern to his sister, warranted a finding by the jury that at least one of Murphy's goals in

unlawfully entering the apartment was to disarm Silver by forcibly taking his handgun.

<u>Cahill</u> consequently does not suggest that the New York courts decided Murphy's appeal

incorrectly since there was proof that Silver's murder was not the only object of the

burglary. <u>See</u> <u>People v. Caruso</u>, 6 A.D.3d 980, 983 n.3 (3d Dep't 2004) (where "evidence

establishe[s] that the burglary . . . carried an intent other than solely to commit the murder

(i.e., stealing) . . . [a] first degree murder conviction is not barred by the holding in <u>People</u>

<u>v. Cahill</u>"); <u>see also</u> <u>People v. Mackey</u>, 49 N.Y.2d 274, 279 (1980) (defendant charged

with burglary in the second degree is not entitled to a bill of particulars specifying which

crime he intended to commit within the building because "the Revised Penal Law's

definition of burglary is satisfied if the intruder's intent, existing at the time of the

unlawful entry or remaining, is to commit any crime").

Thus, Murphy has not shown that the statute under which he was convicted permitted the jury to find him guilty arbitrarily and capriciously. Indeed, he has not even shown that his first degree murder conviction violated state law. His conviction reduction claim consequently does not entitle him to habeas relief.

### 7. Ineffective Assistance of Trial Counsel

Murphy's final contention is that he was denied the effective assistance of trial counsel. (See Ex. M). Specifically, he complains that his counsel's defense strategy was "prejudicial," that he was advised not to testify before the grand jury or at trial, and that she never procured any defense witnesses. (Id. (Aff. of Elliot Murphy, sworn to on Jan. 20, 2006, ¶ 5)). He apparently also claimed, in papers which are not before this Court, that he had an alibi witness. (See Ex. O at 3).

To succeed on his claim of ineffectiveness, Murphy must show that (a) his counsel's performance "fell below an objective standard of reasonableness," and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance." Id. at 689. As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Murphy's Sixth Amendment claim fails to satisfy either branch of

Strickland.  Although he suggests that he should have been permitted to testify before the

grand jury and at trial, he fails to set forth what he would have said or explain why it

might have changed the outcome of his case.  Moreover, Murphy was a predicate felon

with several felony convictions.  (S. 23-24).  In light of his criminal record, Murphy

cannot overcome the presumption that his attorney's recommendation that he not testify

was objectively reasonable.

Murphy's companion suggestion that his attorney should have called other

defense witnesses, including alibi witnesses, is no more meritorious.  As Justice

FitzGerald noted in his decision denying Murphy's CPL § 440.10 motion, Murphy "failed

to provide any sworn factual allegations to suggest an alibi witness existed or that she

would have been helpful."  (Ex. O at 3).  Obviously, in the absence of such proof,

Murphy cannot show that he was prejudiced by the failure to call an alibi witness.[8]

Finally, Murphy's carping about his trial attorney's strategy is wholly

misplaced.  As Justice FitzGerald noted:

> [Counsel] filed extensive preliminary motions and was
> successful in convincing the court to suppress the defendant's
> statements to law enforcement personnel.  Her objections at
> trial were cogent and, contrary to the defendant's bald
> assertions to the contrary, she displayed a high degree of

---

[8]     The People's papers opposing Murphy's motion to vacate his judgment of
conviction indicate that he also complained about his counsel's failure to call character witnesses
on his behalf.  (See Ex. N at 7).  Given Murphy's criminal record, it likely would have been
malpractice for his counsel to have called such witnesses.

> professional competence. Indeed, she advocated doggedly for
> the defendant, even through the sentencing proceeding, where
> she successfully opposed the People's recommendation that
> the defendant be sentenced to life in prison without parole.

(Ex. O at 3). Murphy has not shown that these factual findings were unreasonable or that

the state court misapplied <u>Strickland</u>. Indeed, defense counsel pursued the only defense

potentially available, which was that Murphy was misidentified. That this defense proved

unsuccessful is not surprising since Murphy was identified by both the victim and an

eyewitness, and his own sister testified to facts that placed him at the scene of the crime.

Accordingly, notwithstanding Murphy's Monday morning quarterbacking,

there clearly is no factual or legal basis for Murphy's Sixth Amendment ineffective

assistance of counsel claim.

IV.    <u>Conclusion</u>

For the foregoing reasons, Murphy's Petition should be denied.

Furthermore, because Murphy has not made the substantial showing of the denial of a

constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability

should not be issued.

V.    <u>Notice of Procedure for Filing of Objections to this Report and Recommendation</u>

The parties shall have ten (10) days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a) and (d). Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Sidney H. Stein and to my chambers at the United

States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing

parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an

extension of time for filing objections must be directed to Judge Stein. The failure to file

these timely objections will result in a waiver of those objections for purposes of appeal.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140

(1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).


Dated:      New York, New York
            August 7, 2008

                                        _____
                                      / FRANK MAAS
                                        United States Magistrate Judge



Copies to:

Elliot Murphy
00-A-4098
Sullivan Correctional Facility
P.O. Box 116
Fallsburg, New York 12733

Susan Gliner, Esq.
Assistant District Attorney
One Hogan Place
New York, New York 10013